IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 12-cv-00269-RBJ-MJW

UNITED STATES OF AMERICA,
Ex rel. EDWIN RUOTSINOJA,

    Plaintiff,

v.

BOARD OF GOVERNORS OF THE COLORADO STATE UNIVERSITY SYSTEM,

    Defendant.

---

ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

---

Before the Court is a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) filed by defendant, the Board of Governors of Colorado State University ("the Board"). The case arises under the *qui tam* provisions of the False Claims Act ("FCA"), 31 U.S.C. § 3730, and therefore the Court has jurisdiction pursuant to 28 U.S.C. § 1331. The Court concludes that the Board is an "arm-of-the-state" immune from *qui tam* lawsuits where the United States has declined to intervene and therefore grants the motion.

**I.    Factual Background**

This case was filed by Mr. Edwin Ruotsinoja, the former Director of Business and Financial Services for Colorado State University ("CSU"). He alleges that CSU has presented false claims for payment to the federal government, causing the university to collect more money than it was entitled to receive under federal grant programs administered by the Department of Health and Human Services. [ECF No. 36 at 1-3.] CSU is a land-grant university in Colorado,

and it is designated as the exclusive university to offer agricultural and forestry programs in the state. Colo. Rev. Stat. § 23-31-101.

## II.     Procedural Background

On February 1, 2012, Mr. Routsinoja filed under seal his complaint against CSU. The U.S. Department of Justice investigated this initial complaint but ultimately declined to intervene on July 3, 2013.[1] Defendant filed a motion to dismiss on January 16, 2014 stating that the Board of Trustees was the only entity capable of being sued in this case. In response, Mr. Routsinoja amended his complaint on February 6, 2014, substituting the Board as the defendant. The Board now moves to dismiss the amended complaint on the grounds that the Board is not a person for purposes of the FCA when the United States has declined to intervene, and that alternatively, the Eleventh Amendment provides immunity from suit.

---

[1] Pursuant to 31 U.S.C. § 3730(b)(4)(B), the United States declined to intervene in this action. [ECF No. 19.] In doing so, the Attorney General cited 31 U.S.C. § 3730(b)(1) and invited the Court to "solicit the written consent of the United States before ruling or granting its approval" of any proposed dismissal, settlement, or discontinuation. *Id.* Section 3730(b)(1) states that an action under the False Claims Act "may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting." 31 U.S.C. § 3730(b)(1). The Court declines the invitation. In this situation, where the court lacks subject matter jurisdiction over the matter, the Attorney General's consent is not required. Moreover, by deciding not to intervene, the Attorney General has effectively consented to non-voluntary dismissal of this action. *See Minotti v. Lensink*, 895 F.2d 100, 103-04 (2d Cir. 1990) ("[W]e hold that the provision requiring consent of the Attorney General prior to dismissal of a private action, as it reads today, continues to apply only where the plaintiff seeks voluntary dismissal of the action pursuant to Federal Rule of Civil Procedure 41(a), and not where the court orders dismissal."); *U.S. ex rel. Fletcher v. Fahey*, 121 F.2d 28, 29 (D.C. Cir. 1941) (finding that the statute did not prohibit dismissal for failure to state a cause of action without prior approval of the United States Attorney); *U.S. ex rel. Dimartino v. Intelligent Decisions, Inc.*, 308 F. Supp. 2d 1318, 1321 (M.D. Fla. 2004) (holding that the plain language of the statute requires "the Attorney General's consent before a relator may *voluntarily* dismiss an action") (emphasis added).

### III.  Discussion

#### a.  Standard of Review.

In the context of qui tam litigation, whether the court has subject matter jurisdiction is often only answered by considering the merits. For that reason, courts treat motions to dismiss for lack of subject matter jurisdiction in *qui tam* actions as motions to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6). *United States* ex rel. *Fine v. MK-Ferguson Co.*, 99 F.3d 1538, 1543 (10th Cir. 1996) ("When a court's subject matter jurisdiction depends upon the same statute that creates the substantive claims, the jurisdictional inquiry is necessarily intertwined with the merits. . . . This court has determined that these 'intertwined' jurisdictional inquiries should be resolved under Federal Rule of Civil Procedure 12(b)(6). . . .") (citations omitted).

> When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations. A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 motion.

*Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995) (citations omitted).

#### b.  CSU is an Arm-of-the-State for Purposes of the False Claims Act.

The False Claims Act creates civil penalties for submitting false claims for payment to the United States government. 31 U.S.C. § 3729. The Act may be enforced by the Attorney General, but the statute also authorizes civil suits by private citizens on behalf of the United States. 31 U.S.C. § 3730. These private actions are referred to as *qui tam* actions. Yet when a private citizen brings suit under these provisions, certain limitations apply. One limitation in particular is relevant to this motion: in cases where a private individual brings the suit "the False

Claims Act does not subject a State (or state agency) to liability in such actions." *Vermont Agency of Nat. Res. v. United States* ex rel. *Stevens*, 529 U.S. 765, 778 (2000).

The United States Supreme Court created this exception for States after recognizing the "virtual coincidence of scope" between the statutory question of whether an entity is a "person" for purposes of the FCA and the constitutional question of whether the entity is immune from suit under the Eleventh Amendment. *Id.* at 780. Because of this "coincidence of scope" the Tenth Circuit has "conclude[d] that the appropriate approach to determine if a state-related entity is subject to liability under the FCA is to apply Eleventh Amendment arm-of-the-state analysis." *United States* ex rel. *Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 718 (10th Cir. 2006). This analysis exists to immunize those entities that "operate as alter egos or instrumentalities of the states." *Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 574 (10th Cir. 1996). The analysis requires an examination of three factors:

> (1) the state's legal liability for a judgment; (2) the degree of autonomy from the state—both as a matter of law and the amount of guidance and control exercised by the state; and (3) the extent of financing the agency receives independent of the state treasury and its ability to provide for its own financing.

*Sikkenga*, 472 F.3d at 718 (citing *Sturdevant v. Paulsen*, 218 F.3d 1160, 1164 (10th Cir. 2000)).

### 1. State Liability for Judgment.

The first factor—whether the state could be legally liable for a judgment in this case—is a close call. Mr. Ruotsinoja notes that CSU has opted out of the state's risk management insurance program, choosing instead to purchase its own insurance. He suggests that this indicates that Colorado could never be required to pay a judgment in this case. However, in a similar case assessing the arm-of-the-state status of the University of Colorado, the Colorado Court of Appeals concluded that "the fact that an entity is self-insured is not definitive in determining status . . . . Rather . . . it is the entity's potential legal liability . . . that is relevant."

*Hartman v. Regents of Univ. of Colo.*, 22 P.3d 524, 528 (Colo. App. 2000). Even if Mr. Ruotsinoja is correct that the State of Colorado would not be "on the hook" in this case, my analysis of the remaining two factors could independently support a finding that CSU and its Board are an arm-of-the-state.

### 2. State Guidance and Control.

The remaining two prongs yield results strongly in favor of finding the Board to be an arm-of-the-state. Colorado law is replete with characterizations of CSU as a state agency. The provision in the state constitution founding CSU recognizes it as a "state institution of higher education . . . subject to the control of the state." *See* Colo. Const. art. VIII, § 5. CSU is the exclusive state university to offer programs in agriculture, forestry, natural resources, and veterinary medicine in Colorado. Colo. Rev. Stat. § 23-31-101. The Colorado Governmental Immunity Act ("CGIA") defines "state" as every "board . . . and every state institution of higher education, whether established by the state constitution or by law." Colo. Rev. Stat. § 24-10-103(7).

The Board is entitled to representation by the Colorado Attorney General as a matter of state law. *Hartman v. Regents of Univ. of Colo.*, 22 P.3d 524, 527 (Colo. 2000) (citing Colo. Rev. Stat. §§ 24-31-201(3), 23-20-110). Colorado's state ethics code classifies state institutions of higher education as state agencies. Colo. Rev. Stat. § 24-18-104(9). CSU's president is designated by statute as the appointing authority for state personnel working at the university. Colo. Rev. Stat. § 24-50-101(3)(d). About 26 percent of CSU's employees are state classified employees, and Colorado law defines CSU as a "state agency" in relation to these employees. *See* ECF No. 41 at 13; Colo. Rev. Stat. § 24-30-1301(12).

Legislative labels aside, CSU and the Board operate with substantial state control and guidance. Nine of the Board's fifteen members are appointed by the Governor and confirmed by the Senate. Colo. Rev. Stat. § 23-30-101. The remaining members are chosen by election across the entire statewide university system. *Id.* Another state board, the Colorado Commission of Higher Education, provides oversight of CSU. Colo. Rev. Stat. §§ 23-1-105, 23-31-101. Together, these facts evince a substantial amount of state control over CSU and its Board. While Colorado has delegated a great deal of autonomy to the Board with regard to CSU's operations, it has retained significant control over the composition of the Board and oversight of its role within the state's public university system generally and over its finances specifically.

### 3. State Financing.

A significant portion—although not the majority—of CSU's financial support comes from the State of Colorado, and the state controls important aspects of CSU's financial affairs. First, CSU receives annual appropriations from the Legislature. Colo. Rev. Stat. §§ 23-18-202 (establishing payments from Colorado's College Opportunity Fund ("COF")). Colorado provides additional funds in the form of fee-for-service contracts. The university received $110 million from the state in 2013 and expects $132 million in 2014. [ECF No. 38, ¶ 4.] In 2014, this amount will constitute about 20 percent of the Board's Education and General Budget. *Id.* ¶ 7. In *Watson*, the Tenth Circuit considered whether the fact that the University of Utah's medical center received only 5 percent of its annual budget from state appropriations meant that it was autonomous and not entitled to arm-of-the-state status under the Eleventh Amendment. 75 F.3d at 576. Acknowledging that the "funding issue makes this a close case," the court nonetheless concluded that the medical center was entitled to immunity. Here, by contrast, CSU's state-derived funding is essentially four times larger than the state funding in *Watson*.

Colorado's financial oversight does not end when money is transferred to CSU. State appropriations are held in a special account. While that account is separate from the state general fund, it is subject to some state control such as state directed investments. Colo. Rev. Stat. § 23-30-106. The state legislature, moreover, has limited the Board's ability to set and raise tuition, requiring approval from the Commission on Higher Education for tuition increases above a certain percentage. Colo. Rev. Stat. § 23-5-130.5; *cf. Watson*, 75 F.3d at 576 (finding arm-of-the-state status for the University of Utah Medical Center notwithstanding the fact that the center could "increase patient billings" *without* state approval).

Mr. Ruotsinoja highlights CSU's "enterprise" designation under Colorado's Taxpayer Bill of Rights ("TABOR") as evidence that CSU is autonomous, independently-funded, and "more akin to an independent self-supporting business" than an arm-of-the-state. [ECF No. 40 at 1.] That position stretches the implications of enterprise status too far.

TABOR imposes tight limits on taxing, spending, and debt obligations incurred by Colorado and the state's various agencies. The law, however, exempts certain "enterprises" from these limits. Colo. Const. art. X, § 20(2)(d) (defining an "enterprise" as a government-owned business receiving under 10 percent of annual revenue in grants from Colorado governments). The portion of the law relevant to this case recognizes state universities as state entities but allows them to obtain enterprise designation. Colo. Rev. Stat. §§ 24-77-102(16)(III) (noting that "state" includes state institutions of higher education); 23-5-101.7 (allowing CSU and other state institutions of higher education to obtain enterprise status).

The availability of enterprise status for certain state agencies does not transform them into private enterprises. Rather, it allows them to function with a greater degree of financial independence from the state. The Board points out that other agencies that are appear to be

squarely within the category of arms-of-the-state nonetheless share the same enterprise status exempting them from TABOR.  *See, e.g.*, Colo. Rev. Stat. § 33-9-105 (Colorado Division and Commission of Parks and Wildlife); *id.* § 35-65-405 (Colorado State Fair Authority and Board of Commissioners); *id.* § 26-12-110 (Colorado State Nursing Homes).  Moreover, enterprise status under TABOR did not affect the University of Colorado's Eleventh Amendment immunity as an arm-of-the-state in *Harrison v. Univ. of Colo. Health Sciences Ctr.*, 337 Fed. App'x 750, 753 (10th Cir. 2009) or in *Robinson v. Bd. of Regents of Univ. of Colo.*, 390 F. Supp. 2d 1011, 1016 (D. Colo. 2005).

Mr. Ruotsinoja argues that COF subsidies and fee-for-service contracts are not grant money, and that somehow this means the true proportion of "state appropriated" money in CSU's budget is much lower than 20 percent.  [ECF No. 40 at 10-11.]  That these funds are not grants is undoubtedly true.  That is one reason why CSU qualifies as an enterprise under TABOR.  The Board does not appear to dispute this characterization of the state financial support.  Nonetheless, Mr. Ruotsinoja fails to take the next step and identify why this distinction between grant money and non-grant state support compels a different conclusion in the arm-of-the-state analysis.  At the end of the day, CSU is still receiving substantial financial support from Colorado, and that is what drives the analysis.

Overall, Mr. Ruotsinoja marshals scant legal authority that CSU is an independent entity, focusing instead on trying to minimize the importance of the authorities cited by the defendant. None of these attempts at minimization is persuasive.  For example, Mr. Ruotsinoja contends that CSU's arguments are weak because they rely on provisions of Colorado law that provide *definitions* of "state agencies."  [ECF No. 40 at 3.]  But Mr. Ruotsinoja does not explain why these provisions defining the term should be viewed skeptically or given less weight than other

parts of Colorado's statutes. Rather CSU's ability to point to several Colorado statutes that define a "state agency" as including state institutions of higher education is strong evidence that the legislature views CSU as an arm-of-the-state. This conclusion might be weakened if Mr. Ruotsinoja could point to other statutes or cases that suggest the legislature takes a different view, but Mr. Ruotsinoja offers nothing besides CSU's enterprise designation under TABOR, its exemption from state procurement rules (Colo. Rev. Stat. § 24-101-301(10)(a)), and CSU's decision not to participate in the state's risk management program (Colo. Rev. Stat. § 24-30-1502(5)(b)). He also provides a litany of statutes giving CSU power and discretion to direct its internal academic, administrative, and financial affairs. [ECF No. 40 at 7-8.]

I agree with Mr. Ruotsinoja that if these facts were considered in isolation they would counsel against arm-of-the-state status for CSU. But they cannot be considered in isolation, and when balanced against the weight of evidence advanced by CSU it is clear that Colorado retains significant control over CSU and the Board and provides substantial financial support to those entities.

This conclusion dovetails with the substantial number of cases that have already recognized that public universities and their governing boards are arms-of-the-state. The Tenth Circuit has stated that its precedent has "consistently found state universities are arms of the state." *Watson*, 75 F.3d at 575; *see e.g.*, *Mascheroni v. Bd. of Regents of the Univ. of Cal.*, 28 F.3d 1554, 1559 (10th Cir. 1994) (University of California); *Korgich v. Regents of N.M. Sch. Of Mines*, 582 F.2d 549, 551-52 (10th Cir. 1978) (New Mexico School of Mines); *Prebble v. Brodrick*, 535 F.2d 605, 610 (10th Cir. 1976) (University of Wyoming); *Brennan v. Univ. of Kan.*, 451 F.2d 1287, 1290 (10th Cir. 1971) (University of Kansas).

To be sure, never before have the Court of Appeals for the Tenth Circuit or the Colorado courts been asked to decide whether the Board of Governors of CSU is an arm-of-the-state. And this Board appears to possess powers and independence greater than those of university defendants in cases prior to *Watson*. Even so, the Board's functions by-and-large mirror those of other public university systems found to be arms-of-the-state, and CSU is not so different from these other institutions to warrant wholesale departure from this extensive corpus of judicial interpretation.

### c. Eleventh Amendment Immunity.

As noted above, the arm-of-the-state analysis under the FCA is intertwined with the Eleventh Amendment immunity analysis. Because I find that the Board is an arm-of-the-state for FCA purposes, I decline to address the Eleventh Amendment's applicability in further detail.

### IV. Conclusion

Mr. Ruotsinoja makes serious allegations about accounting practices at CSU. He no doubt means well and would like to ensure that CSU follows the law. His lawsuit, however, cannot proceed, because CSU and its Board are not "persons" capable of being sued in a *qui tam* action under the False Claims Act. Therefore defendant's motion to dismiss [ECF No. 38] is GRANTED.

DATED this 19th day of May, 2014.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge